UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| JOSEPH AGNEW, *et al.*, | ) | |
| Plaintiffs, | ) | |
| | ) | |
| *vs.* | ) | 1:11-cv-0293-JMS-MJD |
| | ) | |
| NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER ON NCAA'S MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT**

Presently pending before the Court is Defendant National Collegiate Athletic Association's (the "NCAA") Motion to Dismiss. [Dkt. 91.] The NCAA argues that Plaintiffs Joseph Agnew and Patrick Courtney's Amended Complaint, [dkt. 84], must be dismissed because it fails to state a claim on which relief can be granted. *See* Fed. R. Civ. Pro. 12(b)(6). For the following reasons, the Court agrees and dismisses Plaintiffs' Amended Complaint with prejudice.

**I.
STANDARD OF REVIEW**

The Federal Rules of Civil Procedure impose a notice-pleading requirement for complaints. Thus, "[s]pecific facts are not necessary; the [plaintiff] need only 'give the defendant fair notice of what the claim is and the grounds upon which it rests.'" *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (quoting *Bell Atlantic v. Twombly*, 550 U.S. 544 (2007)). Nonetheless, "a complaint may be so sketchy that the complaint does not provide the type of notice of the claim to which the defendant is entitled." *Airborne Beepers & Video, Inc. v. AT&T Mobility LLC*, 499 F.3d 663, 667 (7th Cir. 2007) (synthesizing *Erickson* and *Twombly*). In that circumstance, a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) is proper. A motion filed under that rule asks whether the complaint "contain[s] sufficient factual matter, accepted as true, to

'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) (quoting *Twombly*, 550 U.S. 544). For the purposes of that rule, the Court will ignore legally conclusory allegations. *Id.* at 1949-50 ("Although for the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true, we are not bound to accept as true a legal conclusion couched as a factual allegation."). The Court will, however, give the complaint the benefit of reasonable inferences from all non-conclusory allegations. *See id.*

## II.
### BACKGROUND

This case was initially filed in the United States District Court for the Northern District of California, [dkt. 1], but the NCAA filed a Motion to Transfer to this Court, [dkt. 22]. Contemporaneously with the transfer motion, the NCAA also filed a motion to dismiss. [Dkt. 24.] The parties fully briefed the motion to dismiss, but the Northern District of California declined to rule on that motion after it granted the NCAA's motion to transfer Plaintiffs' case to this Court. [Dkt. 64.]

After transfer, Plaintiffs and the NCAA agreed to a schedule for re-briefing the NCAA's motion to dismiss in light of Seventh Circuit law. [Dkts. 77; 81.] Plaintiffs filed an Amended

Complaint in March 2011 with the NCAA's consent, [dkt. 81], and alleged a violation of Section 1 of the Sherman Act, [dkt. 84 at 20].[1]

Plaintiffs allege that this action "arises out of a blatant price-fixing agreement and restraint between member institutions of the NCAA." [Dkt. 84 at 1 ¶ 1.] Plaintiffs challenge two of the NCAA's bylaws: 1) the one-year scholarship limit, which prohibits NCAA member institutions from offering multi-year athletics-based discounts to student-athletes (NCAA Bylaw 15.3.3.1), and 2) the cap on the number of athletic-based discounts a school can offer per sport each year (*see, e.g.*, NCAA Bylaw 15.5.4). [Dkt. 84 at 10 ¶¶ 28-29.]

Mr. Agnew enrolled at Rice University in 2006 after receiving an athletic scholarship to play football "equal to the yearly cost of his bachelor's degree." [Dkt. 84 at 2 ¶ 5.] Mr. Agnew received formal offers from at least three other schools. [*Id.*] Mr. Agnew was injured during his sophomore season and was told prior to his junior year that his scholarship would not be renewed. [Dkt. 84 at 14 ¶ 47.] He successfully appealed the non-renewal of his scholarship and ultimately "receiv[ed] a full year's tuition despite no longer being a member of the Rice football team." [*Id.* at 14-15 ¶ 47.] Mr. Agnew did not receive tuition for his senior year of college and had to pay tuition and boarding expenses out-of-pocket in order to receive his degree. [Dkt. 84 at 14-15 ¶ 47.]

---

[1] Plaintiffs' Amended Complaint is styled as a class action and asserts certain "class allegations" in addition to the allegations specific to the named Plaintiffs. [*See, e.g.*, dkt. 84 at 18-20.] To date, however, Plaintiffs have not filed a motion to certify a class. Because the Court ultimately finds that Plaintiffs' claims must be dismissed and no motion to certify a class is pending, "the suit must be dismissed because no one besides the plaintiff has a legally protected interest in the litigation." *Wiesmueller v. Kosobucki*, 513 F.3d 784, 786 (7th Cir. 2008); *see also Sheridan v. Marathon Petroleum Co., LLC*, 530 F.3d 590, 592, 596 (7th Cir. 2008) (affirming trial court's dismissal of "entire suit" for failure to state a claim before motion to certify class was filed); *Banks v. Nat'l Collegiate Athletic Ass'n*, 977 F.2d 1081, 1085-86, 1094 (7th Cir. 1992) (dismissing entire suit because named plaintiff failed to allege antitrust claim and no class certification ruling to appeal). Because no motion to certify is pending, the Court will focus on the allegations specific to the named Plaintiffs.

Mr. Courtney enrolled at North Carolina A&T in 2009 after receiving an athletic scholarship to play football "equal to the yearly cost of his bachelor's degree." [Dkt. 84 at 3 ¶ 6.] He injured himself during training camp prior to his freshman season and ultimately was told that his athletic scholarship would not be renewed for his sophomore year. [Dkt. 84 at 15 ¶¶ 48-50.] Mr. Courtney left North Carolina A&T and is currently enrolled in another educational institution where he is paying tuition out-of-pocket. [Dkt. 84 at 15 ¶ 50.]

Plaintiffs allege that without the NCAA Division I bylaws at issue they would have received multi-year athletic scholarships sufficient to cover the entire cost of their bachelor's degrees.[2] [Dkt. 84 at 15 ¶ 51.] Instead, however, Plaintiffs allege that the "NCAA's wholly artificial caps on the number and distribution of athletics-based discounts reduces the overall supply of athletics-based discounts available to student-athletes thereby forcing them to overpay for bachelor's degrees . . . ." [Dkt. 84 at 15-16 ¶ 53.] Likewise, Plaintiffs allege that the NCAA's prohibition on multi-year athletics-based scholarships injures student-athletes by causing them to pay more in tuition when their athletics-based scholarships are reduced or not renewed. [*Id.* at ¶ 54.]

The NCAA filed a Motion to Dismiss Plaintiffs' Amended Complaint, which the parties subsequently briefed. [Dkts. 91; 93; 96; 97.] The Court held oral argument on the NCAA's motion. [Dkt. 116.]

---

[2] Different NCAA bylaws govern Division I, II, and III sports. [Dkt. 93 at 25.] There is no dispute that Plaintiffs received scholarships to play sports at Division I schools. Despite this undisputed fact, as the NCAA points out, the Amended Complaint references Division II and Division III financial aid rules that Plaintiffs were not bound by and could not have been injured by. [Dkt. 93 at 25.] Plaintiffs do not respond to this argument; therefore, the Court construes Plaintiffs' silence as an acceptance of its merit and will not construe the Amended Complaint as stating any claim regarding Division II and III financial rules.

## III.
### DISCUSSION

The NCAA's primary contention is that Plaintiffs have failed to allege a relevant product market, geographic market, or anti-competitive effect on a relevant market to survive a motion to dismiss. The parties dispute whether Plaintiffs were required to allege a relevant market and, if they were required to do so, whether their allegations are sufficient to survive the NCAA's motion to dismiss. Additionally, the NCAA alleges that Plaintiffs lack antitrust standing to challenge the bylaws at issue.

**A. Antitrust Law and Amateur College Sports**

The purpose of the Sherman Act is to rectify injury to consumers caused by diminished competition. *Banks v. National Collegiate Athletic Association*, 977 F.2d 1081, 1087-88 (7th Cir. 1992). Therefore, a plaintiff must allege not only an injury to himself but an injury to the market as well. *Id.* A successful claim under Section 1 of the Sherman Act requires proof of three elements: (1) a contract, combination, or conspiracy; (2) a resultant unreasonable restraint of trade in the relevant market; and (3) an accompanying injury. *Denny's Marina v. Renfro Prods.*, 8 F.3d 1217, 1220 (7th Cir. 1993).

The parties agree that *National Collegiate Athletic Association v. Board of Regents*, 468 U.S. 85 (1984), is the seminal case governing antitrust law in the context of amateur college sports. [Dkt. 96 at 13.] At issue in *Board of Regents* was whether the NCAA's control over the number of football games a university could televise violated Section 1 of the Sherman Act. The Supreme Court recognized that the horizontal restraint at issue typically would be presumed unreasonable and illegal *per se* without inquiry into the particular market context; however, "what is critical is that this case involves an industry in which horizontal restraints on competition are essential if the product is to be available at all." *Id* at 101. Therefore, the Supreme Court applied

the Rule of Reason analysis "to form a judgment about the competitive significance of the restraint."[3] *Id.* at 103. A conclusion that a restraint is unreasonable may be based on either the nature or character of the contracts or the surrounding circumstances giving rise to the inference or presumption that they were intended to restrain trade and enhance prices. *Id.*

In *Board of Regents*, the Supreme Court ultimately concluded that, despite the NCAA's proffered justifications, the NCAA had engaged in unjustified anticompetitive conduct by restraining the number of football games universities could televise. The Supreme Court emphasized, however, that its holding was not a prohibition on the majority of the NCAA's regulations because the NCAA must implement rules to preserve the character and quality of its product:

> What the NCAA and its member institutions market in this case is competition itself -- contests between competing institutions. Of course, this would be completely ineffective if there were no rules on which the competitors agreed to create and define the competition to be marketed. A myriad of rules affecting such matters such as the size of the field, the number of players on a team, and the extent to which physical violence is encouraged or proscribed, all must be agreed upon, and all restrain the manner in which institutions compete. . . . In order to preserve the character and quality of the "product," athletes must not be paid, must be required to attend class, and the like. And the integrity of the "product" cannot be preserved except by mutual agreement; if an institution adopted such restrictions unilaterally, its effectiveness as a competitor on the playing field might soon be destroyed. Thus, the NCAA plays a vital role in enabling college football to preserve its character, and as a result enables a product to be marketed which might otherwise be unavailable. In performing this role, its actions widen consumer choice -- not only the choices available to sports fans but also those available to athletes -- and hence can be viewed as procompetitive.

---

[3] The Supreme Court recently reaffirmed the application of the Rule of Reason to restraints on competition that are essential if the product is to be available at all. *American Needle, Inc. v. National Football League*, 130 S. Ct. 2201, 2216 (2010) (citing *Board of Regents*, 468 U.S. at 101). Although the Court need not conduct the applicable analysis at this stage in the proceedings, for purposes of context, the Rule of Reason tests whether a restraint merely regulates and perhaps thereby promotes competition or whether it may instead suppress or even destroy competition. *American Needle*, 130 S. Ct. at 2217 n. 10 (citation omitted). To analyze that question the Court must typically consider "the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint is imposed; the nature of the restraint and its effect, actual or probable." *Id.*

> \*\*\*
>
> It is reasonable to assume that most of the regulatory controls of the NCAA are justifiable means of fostering competition among amateur athletic teams and therefore procompetitive because they enhance public interest in intercollegiate sports. The specific restraints on football telecasts that are challenged in this case do not, however, fit into the same mold as do rules defining the conditions of the contest, the eligibility of participants, or the manner in which members of a joint enterprise shall share the responsibilities and the benefits of the total venture.
>
> \*\*\*
>
> The NCAA plays a critical role in the maintenance of a revered tradition of amateurism in college sports. There can be no question but that it needs ample latitude to play that role, or that the preservation of the student-athlete in higher education adds richness and diversity to intercollegiate athletics and is entirely consistent with the goals of the Sherman Act.

*Id.* at 101-102, 117, 120.

The Court also finds the Seventh Circuit's opinion in *Banks* to be binding.[4] In *Banks*, the Seventh Circuit Court of Appeals affirmed a district court's decision to grant the NCAA's motion to dismiss a plaintiff's complaint regarding the no-agent and no-draft rules. 977 F.2d at 1081. At issue in *Banks* were rules prohibiting college athletes from participating in intercollegiate sports if they agreed to be represented by an agent or asked to be placed on the draft list of a professional league. *Id.* at 1083-84.

Relying on *Board of Regents*, *Banks* concludes that "allegations that the NCAA rules restrain trade or commerce may not be viewed as *per se* violations of the Sherman Act, but must be addressed under the 'Rule of Reason.'" 977 F.2d at 1088 (quoting *Board of Regents*, 468 U.S. at

---

[4] Plaintiffs urge the Court to reject *Banks* and apply *Chicago Professional Sports Limited Partnership v. National Basketball Association*, 961 F.2d 667 (7th Cir. 1992). [Dkt. 116 at 29.] The Court disagrees with Plaintiffs that *CPSLP* is binding authority in this context. *Banks*, which is more recent, directly addressed an NCAA bylaw in the amateur sports context, while *CPSLP* addressed television broadcast rights in the professional sports context. Therefore, the Court finds the Seventh Circuit's interpretation of *Board of Regents* and its general discussion of NCAA bylaws to be controlling.

85).  Thus, the Seventh Circuit held that in order for a plaintiff's complaint to state a claim upon which relief can be granted, "it must allege anti-competitive effects on a discernible market." *Banks*, 977 F.2d at 1088.

*Banks* also emphasizes that the Court "is not able to review what [plaintiff] could have alleged, but is called upon to review only what he actually alleged." *Id.* at 1087.  The complaint must contain "either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some *viable* legal theory." *Id.* at 1093 (original emphasis) (citation omitted).  A plaintiff may not evade the pleading requirements merely by asserting bare legal conclusions; instead, the facts must outline a violation of the Sherman Act—the plaintiff "will get nowhere merely by dressing them up in the language of antitrust." *Id.* at 1093 (quoting *Car Carriers v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir. 1984)).  Additionally, a plaintiff must tie his alleged antitrust injury to the rule's allegedly anti-competitive impact.  *Banks*, 977 F.2d at 1094 n.20.

### B.  What Plaintiffs Are Required to Plead

Applying the pleading standards detailed above, the Court turns to the parties' arguments regarding the sufficiency of Plaintiffs' allegations.

The NCAA points to three alleged deficiencies with Plaintiffs' Amended Complaint: 1) failure to plead a relevant market; 2) failure to allege facts sufficient to show that the NCAA's alleged wrongdoing has injured competition as a whole in the relevant market; and 3) failure to allege facts connecting the NCAA rules at issue to their alleged injuries.  [Dkt. 93 at 8.]

Plaintiffs contend that the Court should apply the "quick look" version of the Rule of Reason, which Plaintiffs do not believe requires them to plead a relevant market.  [Dkt. 96 at 20, 22.]  Specifically, Plaintiffs argue that because they have alleged that the NCAA's rules regard-

ing athletics-based discounts constitute "a naked restraint of trade and commerce," [dkt. 84 at 11 ¶ 33], they are not required to plead market power and the burden shifts to the NCAA to provide a competitive justification for its restraint, which the Plaintiffs claim the NCAA has not done, [dkt. 96 at 19].

Plaintiffs' argument ignores the Seventh Circuit's clear holding in *Banks* that because the Rule of Reason applies to challenges to NCAA regulations, a plaintiff's complaint "must allege anti-competitive effects on a discernible market" to survive a motion to dismiss. *Banks*, 977 F.2d at 1088. Although Plaintiffs describe *Banks* as a "rambling" opinion and ask the Court to disregard it, [dkt. 116 at 28], this Court is in no position to overrule, disregard, or limit *Banks*, *see Gacy v. Welborn*, 994 F.2d 305, 310 (7th Cir. 1993) (emphasizing that district courts are not permitted to disregard Seventh Circuit authority because "[o]urs is a hierarchical judiciary, and judges of inferior courts must carry out decisions [of higher courts]"). Accordingly, it will adhere to *Banks* as applicable Seventh Circuit precedent and analyze the Plaintiffs' Amended Complaint to determine whether it alleges anti-competitive effects on a discernible market.[5]

---

[5] The parties, particularly Plaintiffs, cite numerous out-of-Circuit cases that they believe support their arguments. Because the Court finds applicable Seventh Circuit precedent to be controlling, it will not address those cases.

The Court also rejects Plaintiffs' argument that the NCAA was required to set forth pro-competitive justifications for its regulations at this stage in the proceedings.[6] [Dkt. 96 at 15.] While the Court agrees with Plaintiffs that the NCAA may be required to set forth procompetitive justifications on summary judgment or at trial if Plaintiffs were to meet their initial burden, *see Board of Regents*, 468 U.S. at 95 (decision issued "[a]fter a full trial"), at this stage in the proceedings the Court focuses on the allegations in Plaintiffs' Amended Complaint, *Banks*, 977 F.2d at 1088; *see also Iqbal*, 129 S. Ct. at 1949 (holding that a motion to dismiss asks whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face'") (quoting *Twombly*, 550 U.S. 544). Therefore, Plaintiffs' argument that the NCAA has failed to meet its "heavy burden of establishing that its conduct is procompetitive" fails, [dkt. 96 at 15], and the Court will not consider the NCAA's proffered procompetitive justifications.[7]

In sum, through the lens of binding Seventh Circuit precedent, the Court will analyze the Plaintiffs' Amended Complaint to determine whether it alleges anti-competitive effects on a discernible market. If it fails to do so, the Court must grant the NCAA's motion to dismiss.

---

[6] At oral argument, the NCAA argued that the one-year scholarship rule makes athletic-based scholarships equivalent to academic scholarships, which typically operate on a year-to-year basis. [Dkt. 116 at 5.] Additionally, the NCAA contended that the one-year scholarship rule takes "some of the potential abuse" out of the recruiting process, which promotes amateurism. [*Id.*] The NCAA's proffered procompetitive justification for the cap on the number of available scholarships is "competitive balance and competitive equity." [*Id.* at 7.] Without such a cap, the NCAA believes that some schools would offer extra scholarships to stockpile players so that those players would be unable to play for a competitor. [*Id.* (referencing Gary Shaw, Meat on the Hoof: The Hidden World of Texas Football (1972)).] The NCAA also made a cogent argument that the bylaws at issue are not anti-competitive because output remains constant. For example, if a student-athlete's scholarship is not renewed, the school will offer that spot to another individual, thereby maintaining output in the market. As detailed below, however, the Court will not address the NCAA's proffered justifications because they are beyond the scope of evaluating Plaintiffs' Amended Complaint.

[7] Likewise, the Court will not address the NCAA's argument that its rules are entitled to a presumption of reasonableness. [Dkt. 93 at 19-22.]

### C. Plaintiffs' Allegations Regarding a Relevant Geographic Market

The NCAA contends that Plaintiffs have failed to allege a relevant geographic market. [Dkt. 93 at 11.] Plaintiffs allege that they have adequately pled the United States as the relevant geographic market. [Dkt. 96 at 26-27.]

When the Rule of Reason applies, as the Seventh Circuit has held it does here, the plaintiff must show that the challenged restraint has an adverse impact on competition in the relevant market, which includes defining a geographic market. *Bi-Rite Oil Co. v. Indiana Farm Bureau Coop. Ass'n*, 908 F.2d 200, 203 (7th Cir. 1990). Identifying a geographic market requires both careful selection of the market area in which the seller operates and to which the purchaser can practicably turn to for supplies. *Republic Tobacco Co. v. N. Atl. Trading Co.*, 381 F.3d 717, 738 (7th Cir. 2004).

The Court rejects the NCAA's argument that the Amended Complaint does not plead a relevant geographic market. Plaintiffs' Amended Complaint references the United States three times. [*See, e.g.*, dkt. 84 at 4 ("There is no major college sports program in the United States that is not an NCAA member, abiding by the NCAA rules.").] Even more importantly, however, the NCAA does not dispute that its member institutions, which abide by its rules, are located throughout the United States and recruit student-athletes from throughout the United States. It is, after all, the *National* Collegiate Athletic Association. Therefore, the Court concludes that Plaintiffs adequately pled a relevant geographic market.

### D. Plaintiffs' Allegations Regarding a Relevant Product Market

The NCAA also argues that Plaintiffs failed to plead a relevant product market. Specifically, the NCAA emphasizes that although Plaintiffs' initial complaint alleged that the relevant market at issue was for "bachelor's degrees from accredited colleges and/or universities," [dkt.

93 at 10-11 (citing dkt. 1 at 5 ¶ 15)], Plaintiffs removed that allegation from their Amended Complaint. Even if Plaintiffs' Amended Complaint implicitly alleges a product market for bachelor's degrees, the NCAA argues that such a market doesn't exist because colleges do not simply sell degrees to anyone willing to pay. [Dkt. 93 at 10.]

In response to the NCAA's motion, Plaintiffs argue that their Amended Complaint sufficiently alleges two product markets: "the market for the *sale* of bachelor's degrees and the labor market for the *purchase* of student athlete services." [Dkt. 96 at 22 (original emphases).]

The Court will analyze each of the proposed markets to determine if the Plaintiffs have alleged a relevant product market.[8] In doing so, the Court will disregard Plaintiffs' antitrust terms of art, such as "naked restraint of trade and commerce," that do not contain an adequate factual basis. *See Car Carriers*, 745 F.2d at 1106 (emphasizing that plaintiff "will get nowhere merely by dressing them up in the language of antitrust").

  i. **Labor Market**

Plaintiffs cite two paragraphs from their Amended Complaint that they claim allege a labor market:

> From Paragraph 16: "NCAA member institutions compete with each other to attract and enroll highly skilled athletes to their institutions for obtaining bachelor's degrees." [Dkt. 84 at 6 ¶ 16.]

---

[8] Although Plaintiffs challenge two NCAA bylaws—the one-year scholarship limit and the cap on the number of athletic-based discounts a school can offer—they do not differentiate between those bylaws when addressing the alleged labor and bachelor's degree markets. The Court presumes that Plaintiffs know what is best for their case and structured their opposition to the NCAA's motion accordingly. *See Greenlaw v. United States*, 554 U.S. 237, 243-44 (2008) ("[W]e rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present . . . . Our adversary system is designed around the premise that the parties know what is best for them, and are responsible for advancing the facts and arguments entitling them to relief.") Therefore, the Court will address each of the markets the Plaintiffs allege without distinguishing between the challenged bylaws.

> From Paragraph 22: "Students with athletic ability often are given athletics-based discounts, i.e., 'grants-in-aid' or 'athletic scholarships,' that may sometimes equal the yearly cost of a bachelor's degree. In effect, these students who receive full or partial athletic-based discounts are paying-in-kind, either in whole or in part, for their bachelor's degrees." [Dkt. 84 at 8 ¶ 22.]

A search of Plaintiffs' Amended Complaint reveals that it does not contain the word "labor" or the words "labor market." This is problematic, given the fact that the Seventh Circuit has admonished courts to review only what is actually alleged. *See Banks*, 977 F.2d at 1087 (instructing that the Court "is not able to review what [plaintiff] could have alleged, but is called upon to review only what he actually alleged").

Even if the Court reads between the lines and infers that Plaintiffs sufficiently alleged a labor market in their Amended Complaint, controlling precedent undercuts Plaintiffs' claim. As the NCAA points out, the Seventh Circuit, in upholding the grant of a motion to dismiss, has already rejected the claim that NCAA member schools could be purchasers of labor because the NCAA eligibility and recruiting requirements "prohibit member colleges from engaging in price competition for players." *Id.* at 1091. Specifically, the Seventh Circuit disagreed with the contention that NCAA colleges could "purchase labor through the grant-in-aid athletic scholarships offered to college players when the value of the scholarship is based upon the school's tuition and room and board, not by the supply and demand for players." *Id.* Therefore, even if the Court accepts that Plaintiffs' Amended Complaint actually pleads a labor market, that market fails as a matter of law because the Seventh Circuit has already rejected the idea of a labor market in the amateur college sports context.

ii. **Market for Bachelor's Degrees**

a. **Plaintiffs' Allegations in Amended Complaint**

Plaintiffs' original complaint contained a heading titled "Relevant Market" and alleged that "[b]achelor's degrees from accredited colleges and/or universities constitute a distinct product market." [Dkt. 1 at 5 ¶ 15.] Plaintiffs removed that heading and allegation from their Amended Complaint, which the NCAA argues is a "deliberately evasive pleading strategy" to avoid addressing the relevant market issue. [Dkt. 93 at 15.] In response to the NCAA's motion, Plaintiffs confirm that they deliberately removed that language from their Amended Complaint "to clarify the legal point that no detailed allegations defining a relevant market were necessary." [Dkt. 96 at 25.]

Plaintiffs' decision to deliberately remove the relevant product market language from their Amended Complaint to clarify their (erroneous) belief that they were not required to plead a relevant market was a gamble, especially given the directly relevant authority in this Circuit. Moreover, Plaintiffs could have amended their pleading as a matter of course in response to the NCAA's motion to dismiss, which highlighted this deficiency and directed Plaintiffs to *Banks*. Fed. R. Civ. Pro. 15(a)(1). Plaintiffs chose not to do so "because pleading [a] market in antitrust cases is a complicated and often time-consuming matter" and they wanted the Court's insight "given the complexity of the economics involved in these cases." [Dkt. 116 at 39; *see also* dkt. 116 at 37 ("[T]o be honest with you, we didn't spend a lot of time in the complaint on the market definition.").] This was another gamble because the Court does not provide insight or advisory opinions. It rules on the issues the parties present and moves on to the next case. *See Brownstone Publ'g, LLC v. AT&T, Inc.*, 2009 U.S. Dist. LEXIS 25485 *7 (S.D. Ind. 2009) ("Motion

practice is not an exercise in trial and error or maybe-maybe not where a party can reserve arguments to present later if earlier ones fail.").

Given the Seventh Circuit's admonition to review only what Plaintiffs actually allege in antitrust cases and Plaintiffs' admission that they deliberately removed the relevant market allegation from their Amended Complaint because they didn't believe they needed to plead it, [dkt. 96 at 25], the Court concludes that Plaintiffs have failed to plead a relevant product market for bachelor's degrees as a matter of law.

### b. Plausibility of the Market for Bachelor's Degrees

Despite their admission that they purposefully removed the language regarding the relevant market for bachelor's degrees from their Amended Complaint, Plaintiffs contend that their Amended Complaint still adequately pleads "the market for the *sale* of bachelor's degrees." [Dkt. 96 at 22 (original emphasis).] Plaintiffs cite various paragraphs from their Amended Complaint to support their contention, specifically quoting the following:

> "The vast majority of salaried positions in the United States require the applicant to possess a bachelor's degree. No reasonable substitute exists for a bachelor's degree from an accredited college or university. Accredited colleges and universities compete for customers, i.e. students on a variety of dimensions including but not limited to price, reputation, job placement, and course offerings. A hypothetical entity that had a monopoly on bachelor's degrees would be able to raise the price of bachelor's degrees significantly for a non-transitory period of time without losing customers."

[Dkt. 96 at 23 (quoting dkt. 84 at 7 ¶ 19).]

The NCAA argues that Plaintiffs' market for the sale of bachelor's degrees fails because colleges and universities do not simply sell degrees to anyone willing to pay tuition. [Dkt. 93 at 10.] Instead, even if a student gains admission to the school and obtains a scholarship, he or she still must earn a bachelor's degree by satisfying the school's particular requirements for grades, credit hours, etc. [Dkt. 93 at 15 n.5.]

To survive the NCAA's Motion to Dismiss, the Amended Complaint must contain "either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some *viable* legal theory." *Banks*, 977 F.2d at 1093 (original emphasis); *see also Iqbal*, 129 S.Ct. at 1949 (the complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face'") (quoting *Twombly*, 550 U.S. 544) (emphasis added).

The Court agrees with the NCAA that the "market" for bachelor's degrees is implausible as a matter of law because people cannot simply purchase bachelor's degrees at Division I colleges and universities. Notwithstanding pop culture lyrics to the contrary, you can't just "mess around and get [a] college degree." Bruno Mars, "Lazy Song," *Doo-Wops & Hooligans*, Atlantic Records (2011). Instead, earning a bachelor's degree requires the student to attend class, take required courses, and maintain certain grades, among many other things. *See Banks*, 977 F.2d at 1090 ("NCAA student-athletes are required to attend class, maintain a minimum grade point average, and enroll and complete a required number of courses to obtain a degree."). Plaintiffs do not dispute that bachelor's degrees cannot be bought or sold outright. [Dkt. 116 at 30, 37.] Because student-athletes still must fulfill certain academic requirements to obtain a degree, and the degree itself cannot be bought or sold outright, Plaintiffs' alleged market for the sale of bachelor's degrees is implausible.

As a final point, the heart of Plaintiffs' claim is speculation that but for the NCAA bylaws at issue they would have successfully negotiated for a four-year, unconditional athletic scholarship. That unconditional scholarship would have given them the opportunity to attend their university tuition-free, regardless of their ability to continue to play sports. Plaintiffs who receive *that* opportunity would *then* have the opportunity to earn a tuition-free bachelor's degree

by meeting the academic requirements to do so.  Contrary to Plaintiffs' proposed "market for the sale of bachelor's degrees," earning a degree does not automatically result from receiving the four-year unconditional scholarships Plaintiffs desire.  Consequently, Plaintiffs' Amended Complaint does not contain allegations necessary to sustain recovery under a viable legal theory.[9]

For the reasons detailed herein, the Court concludes that Plaintiffs' Amended Complaint fails to state a discernible market.  Therefore, the Court grants the NCAA's motion to dismiss and dismisses Plaintiffs' entire action.[10]

### E.  Dismissal With Prejudice

The NCAA requests that the Court dismiss Plaintiffs' Amended Complaint with prejudice.  [Dkt. 93 at 26.]  Plaintiffs request that they be given another opportunity to re-plead their claim if the Court grants the NCAA's motion.  [Dkt. 116 at 38.]

Pursuant to Federal Rule of Civil Procedure 15(a)(1)(B), a plaintiff may amend its complaint as a matter of course in response to a motion to dismiss.  *Brown v. Bowman*, 2011 U.S. Dist. LEXIS 34894 *53-54 (N.D. Ind. 2011).  The 2009 notes to that rule emphasize that this amendment "will force the pleader to consider carefully and promptly the wisdom of amending to meet the arguments in the motion.  A responsive amendment may avoid the need to decide the

---

[9] Because the Court concludes that Plaintiffs have failed to allege a relevant product market, it need not address the NCAA's argument that Plaintiffs have failed to allege injury to competition. [Dkt. 93 at 18-19.]  Additionally, the Court rejects the NCAA's standing argument that the Amended Complaint does not allege that the Plaintiffs were injured by the NCAA Division I bylaws at issue. [Dkt. 93 at 22-25.] Plaintiffs allege that they initially received an athletic scholarship to attend their respective universities but that those scholarships were not renewed after they could no longer play sports, causing them to pay tuition through other means. [Dkt. 84 at 14-15 ¶¶ 43-50.]  They further allege that had they been free to negotiate a four-year scholarship, they would have avoided those costs.  Those allegations are sufficient to establish antitrust standing at this stage in the proceedings.

[10] As detailed in footnote one, *supra*, the Court must dismiss the entire action because no one besides the named Plaintiffs have a legally protected interest in the litigation at this time.  *Wiesmueller*, 513 F.3d at 786; *Sheridan,* 530 F.3d at 592, 596; *Banks*, 977 F.2d at 1085-86.

motion or reduce the number of issues to be decided, and will expedite determination of issues that otherwise might be raised seriatim."

If a plaintiff does not or cannot amend its complaint as a matter of course, Rule 15(a)(2) provides that it may amend its pleading again only with the opposing party's written consent or with the Court's leave.  Rule 15(a)(2) further provides that the Court should give leave "when justice so requires."  The Court is not required to give Plaintiffs another chance to plead their claim if they have already had multiple attempts to cure deficiencies in their pleadings.  *Emery v. Am. Gen. Fin.*, 134 F.3d 1321, 1323 (7th Cir. 1998).   If an amended complaint does not differ significantly from an original complaint, it presumably represents the plaintiff's best effort to state a claim against the defendant.  *Katz v. Household Int'l*, 91 F.3d 1036, 1038 n.2 (7th Cir. 1996).

Plaintiffs have already had two opportunities to plead their claim against the NCAA, and their first opportunity to re-plead followed a fully briefed motion to dismiss that, among other things, challenged Plaintiffs' product market allegations.  [Dkt. 24 at 17.]  The NCAA consented to Plaintiffs request to re-plead their complaint after the claim was transferred to this Court, [dkt. 81 at 1], but subsequently filed another motion to dismiss, [dkt. 91].  Plaintiffs chose not to exercise their right to amend their pleading as a matter of course pursuant to Rule 15(a)(1)(B) in response to the NCAA's new responsive pleading and, instead, chose to brief the motion to dismiss and adjudicate the issues.  Plaintiffs also acknowledge making the deliberate choice to remove specific allegations as to a relevant market from their Complaint.

The Court is not required to give Plaintiffs another chance to plead their claim because they have already had multiple attempts to cure deficiencies in their pleadings.  *See Emery*, 134 F.3d at 1323.  Further, Plaintiffs have not given any indication that they could, in fact, success-

fully amend their complaint to cure the defects identified above, even if given the opportunity to do so. Considering the procedural history of this case, particularly the fact that Plaintiffs have already had the opportunity to re-plead their allegations after a fully briefed motion to dismiss, the Court, in its discretion, dismisses Plaintiffs' claim with prejudice.

## IV.
### CONCLUSION

For the reasons detailed herein, the Court **GRANTS** the NCAA's Motion to Dismiss, [dkt. 91], and **DISMISSES** Plaintiffs' Amended Complaint **WITH PREJUDICE**. Given this ruling, the NCAA's Motion for Protective Order, [dkt. 114], and Plaintiffs' Motion to Compel Discovery, [dkt. 121], are **DENIED AS MOOT**. Final judgment shall issue accordingly.

09/01/2011

_(signature)_
Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only**

Leonard W. Aragon
HAGEN BERMAN SOBOL SHAPIRO LLP
leonard@hbsslaw.com

Steve W. Berman
HAGENS BERMAN SOBOL SHAPIRO LLP
steve@hbsslaw.com

Robert B. Carey
HAGENS BERMAN SOBOL SHAPIRO LLP
rob.carey@att.net

Brad A. Catlin
PRICE WAICUKAUSKI & RILEY
bcatlin@price-law.com

Gregory L. Curtner

Miller Canfield Paddock and Stone, P.L.C.
curtner@millercanfield.com

Kimberly K. Kefalas
Miller Canfield Paddock and Stone PLC
kefalas@millercanfield.com

Jennifer L. Murray
THE PAYNTER LAW FIRM PLLC
jmurray@smplegal.com

Kathy Lynn Osborn
BAKER & DANIELS - Indianapolis
klosborn@bakerd.com

Stuart McKinley Paynter
The Paynter Law Firm PLLC
stuart@smplegal.com

William N. Riley
PRICE WAICUKAUSKI & RILEY
wriley@price-law.com

Shana E. Scarlett
Hagens Berman Sobol Shapiro LLP
shanas@hbsslaw.com

Kimberly Lynn Scott
MILLER CANFIELD PADDOCK AND STONE, PLC
scott@millercanfield.com

Jessica A. Sprovtsoff
MILLER CANFIELD PADDOCK AND STONE PLC
sprovtsoff@millercanfield.com

Suzanne Wahl
Miller Canfield Paddock & Stone PLC
wahl@millercanfield.com

Robert James Wierenga
Miller Canfield Paddock & Stone, P.L.C.
wierenga@millercanfield.com

Joseph N. Williams
PRICE WAICUKAUSKI & RILEY
jwilliams@price-law.com